## KENNEDY v. THE STATE.

Under the facts of the case, the presiding judge erred in refusing to grant, upon petition, a change of venue.

FEBRUARY 18, 1914.

Application for change of venue. Before Judge Rawlings. Emanuel superior court. January 17, 1914.

Lee Kennedy, against whom an indictment for the offense of murder had been returned by the grand jury of Emanuel county, presented a petition to the judge of the superior court in the circuit which embraces that county, praying for a change of venue to some other county, on the ground of existing danger of mob violence and lynching of the accused. A hearing was had in chambers, and in support of the petition two affidavits were submitted. They were executed on the day when the petition was presented. After consideration of the application and evidence, the judge entered an order refusing to grant the change of venue. A bill of exceptions was sued out, assigning error on this judgment. The petition was verified by O. A. Kennedy. The allegations were to the following effect: Maud Kennedy, the wife of the petitioner, was wounded October 25, 1913. On the following day petitioner was arrested for the crime and lodged in the common jail of the county. There were immediate threats to lynch him, and on the night of the 26th a number of infuriated citizens threatened to mob him, and they were prevented from doing so only by the energetic action of the sheriff. In consequence of the inflamed state of the public mind and the danger of his being lynched, the petitioner was, on November 16, taken to the common jail of Chatham county for safe-keeping and protection, and is still being confined there. On November 20 the wife died, and since her death the public mind of the county has become greatly inflamed against petitioner. An indictment was returned January 13, 1914, charging him with murder. The danger of his being lynched and of mob violence upon him still exists, if he should be brought back to the county for trial.

One of the two affidavits referred to was made by O. A. Kennedy, the brother of the accused, who deposed in substance as follows: On October 26, 1913, the day after it is alleged that the accused shot his wife and struck her with a gun, the affiant visited the accused and saw him at his home in Emanuel county. The wife was

then living, and continued to live until November 20, 1913. A considerable crowd was gathered at the home of the accused at the time of the visit of the affiant. On that occasion the affiant heard threats on all hands by members of the crowd to lynch the accused because he had shot his wife. These threats were generally made within the presence and hearing of the affiant, although it was known that he was the brother of the accused. On or about November 16, 1913, and before the death of the wife, the accused was, by action of the proper authorities of Emanuel county, removed from the common jail of that county to the common jail of Chatham county, for fear that he would be lynched if his wife should die; and he has ever since been confined in the common jail of Chatham county for fear that he would be lynched if brought back to Emanuel county. The affiant has been in Emanuel county "off and on" since November 16, 1913. He found the public mind of the county greatly excited and inflamed against the accused. He spent Monday, Tuesday, and Wednesday of the week preceding the application in Swainsboro, the county site, and in the county, for the purpose of sounding the public sentiment, to ascertain if it would be safe for the accused to be brought back to the county for trial during the succeeding week. He found the public mind still greatly inflamed against the accused, and he found a great majority of those with whom he talked to be of the opinion that it was unsafe and dangerous for the accused to be brought back to that county for trial. The people with whom he talked were residents of the county, and well acquainted with the people and public sentiment of the county. Affiant is of the opinion, from his knowledge of the public sentiment in the county, that the accused would be in danger of lynching or mob violence if he were brought back to that county for trial. He has been informed by the sheriff that the latter was called up by telephone, on October 26, 1913, by persons "preferring" [preparing?] to go to Swainsboro that night to lynch the accused, although his wife was not then dead, and that the accused was then prevented from being lynched or mobbed only by the reply of the sheriff that he had plenty of men and intended to protect the prisoner, and that the .mob would have to kill him and his assistants before they would lynch the accused.

The other affidavit, made by William Faircloth, was in substance

as follows: He was born and reared in Emanuel county, and is well acquainted with the people and public sentiment of the county. On October 26, 1913, the day after the accused is alleged to have shot his wife, the affiant visited him at his home. He found the public mind greatly inflamed against the accused. Some of the crowd gathered at the home of the latter were angry and threatening. On October 26, before the death of his wife, the accused was taken to the jail at Swainsboro. The affiant was informed by reliable residents of the county on that date, while the affiant was at the home of the accused, that a mob was then being formed to lynch the accused. On or about November 16, 1913, nearly a month after the wife was shot, the accused was removed by the proper authorities of the county from the common jail of Emanuel county to that of Chatham county, for his safety, and for the purpose of preventing his being lynched, and to protect him from mob violence. He was so removed before the death of his wife because of the well-grounded fear that he would be lynched when she died. The affiant has visited the county of Emanuel frequently since October 26, 1913, and was in that county during the most of the week when the petition was presented. He sounded public sentiment of the county in regard to the accused. He found the public sentiment still greatly inflamed against the accused, and was advised by reputable citizens of the county that the accused would be in danger of lynching and mob violence if brought back for trial. In the affiant's opinion, founded on thorough and painstaking investigation, the accused will be in danger of mob violence if brought back into the county. The affiant has been informed by the prosecutor in the case that he was afraid that the accused would be subject to mob violence for the offense. The affiant proposed to the prosecutor to permit the accused to submit to a verdict of guilty with a recommendation to life imprisonment. The prosecutor told the affiant that the former did not want the accused hung, but that he could not consent to the verdict suggested, because of the course he (the prosecutor) took on the night of the day his daughter, the deceased, was shot and the next day, when he appealed to the crowd not to do violence to the accused, but to let the law take its course; and that he feared violence if he consented to such verdict.

*Hines & Jordan* and *C. S. Claxton,* for plaintiff in error.

*R. Lee Moore, solicitor-general,* contra.

ATKINSON, J. The proceeding for change of venue was instituted under the provisions of the act approved August 21, 1911 (Acts 1911, p. 74), relating to the change of venue in criminal cases. Prior to the approval of this act another had been enacted on the same subject (Acts 1895, p. 70). Penal Code § 964 et seq. In the act of 1895 it is provided that the defendant in any criminal case in the superior court may move by a petition in writing for a change of venue, "whenever in his judgment an impartial jury can not be obtained in the county where the crime was committed;" and if, from the evidence submitted, the court shall be satisfied that an impartial jury can not be obtained to try the case, the judge shall transfer it for trial to some other county to be selected in a manner specified. It will be noted that the change of venue thus provided for relates only to the obtainment of an impartial jury to try the accused. The act of 1911 is amendatory of that of 1905, and provides for an additional ground for the change of venue in criminal cases. It was so construed in the case of *Coleman* v. *George,* 140 *Ga.* 619 (79 S. E. 543). The amending act, which relates to the new or additional ground for change of venue in criminal cases, is in part as follows: "It shall be lawful for the judge of the superior court of the circuit in which a crime is alleged to have been committed to change the venue for the trial of said case, on his own motion, with or without petition, whenever, in his judgment, the accused party will be lynched, or there is danger of violence being attempted to be committed on said accused, if carried back, or allowed to remain in the county where the crime is alleged to have been committed. And if a motion by petition shall be made by the accused for a change of venue, said judge shall hear the same at chambers, with or without the presence of the accused, at such time and place in the State as he may direct. And if the evidence submitted shall reasonably show that there is a probability or danger of lynching, or other violence, then it shall be mandatory on said judge to change the venue to such county in the State as, in his judgment, will avoid such lynching." It thus appears that before amendment the statute looked only to the obtainment of an impartial jury, and that after amendment it also regarded the personal safety of the accused and the orderly enforcement of the law. Why should the legislature provide this additional ground for the change of venue?

It is matter of history and common knowledge, that, in this State as well as elsewhere, lynchings occur, and that the defendant in criminal cases is subject to violence or put in danger of violence. At times the militia has been called out to preserve order, and to protect the accused, so that the trial of a criminal case might proceed. There was at times not only danger of violence to the accused but also danger of collisions between the militia and the people. The use of the military at trials in the courts, the irritation in the public mind, caused by the magnitude or the enormity of the crime, the danger of conflicts, and that the trial would not always proceed in an orderly and lawful manner, or that in enforcing the law the lives of others might be risked or sacrificed, all appealed to the legislative mind; and they determined to enact a remedy which would, as far as practicable, do away with these evils. They were unwilling to leave the law, as it stood before the amendment, to the general determination of the judge as to whether a fair and impartial jury could be obtained. They passed this additional act which provided for a speedy, direct, and effective method of changing the venue of the trial, if the accused would be lynched or if there was danger of violence being attempted to be committed upon him if carried back or allowed to remain in the county where the crime was alleged to have been committed. If administered properly and in the spirit of the act, it would, in a large measure, avoid the dangers above enumerated. That the remedy provided might be effectual, the legislators, not content to merely say that if the judge of the superior court was of the opinion that a fair trial could not be had he might or should grant a change of venue, declared that, under the conditions mentioned in the amendatory part of the above-quoted act, it should be mandatory on the judge of the superior court to change the venue. This did not merely confer upon him the power or discretionary right, but placed upon him a solemn and mandatory duty. The most casual reading of this law will show the imperative nature of the duty placed upon the judge of the superior court if the evidence reasonably shows that there is a probability or danger of lynching or other violence. In the light of this law, how stands the case before us?

If the petition and the affidavits submitted in support thereof do not reasonably show on their face that there is a probability or

danger of lynching, or other violence to the accused, then it is difficult to conceive of a case to which the legislative act would be applicable, and it might be declared at once of no effect. It is useless to argue the question. The reading of the petition and the affidavits presents an unanswerable argument, and we are unable to perceive how any one can read them and declare that on their face they do not reasonably show a danger of lynching or other violence. It is only necessary to read the legislative declaration, and then read these papers, to show beyond peradventure that the presiding judge erred in refusing, upon considering them, without more, to grant the change of venue prayed.

But it is suggested that the judge should have heard counter-affidavits from the side of the State; and that while it is the duty of this court to reverse the judgment, we should send it back for another hearing in order that if there should be any such evidence it may be introduced. There is not the faintest hint in this record that there was any conflict in facts, or that there was any conflicting evidence to be introduced, or that the judge desired to hear or consider any further evidence in order to reach a conclusion. It is contended that it was the duty of the judge to set down the case for a hearing; and, as he did not do so, that this court should remand the case with direction that such hearing be had.

It will be noticed, in the excerpt from the act of the legislature, above quoted, that two methods of procedure are provided for. In the first place the judge may of his own motion, and "with or without petition," grant a change of venue. The second is for a setting down and hearing at chambers. If the judge may grant a change of venue "with or without petition," then, under the act, he has power to grant the order upon the petition being presented. To say that he has power to grant it, but if he refuses the accused is without remedy, would be to destroy the act. To hold that if he does erroneously refuse to grant a change of venue upon uncontradicted evidence, and passes a final order to that effect, and the accused excepts, he accomplishes nothing except to get the judge to set down the case for a hearing, possibly with the addition of some other evidence raising more or less conflict, would be of small benefit to the accused, and would little comport with the purpose of this act. This proceeding can not be analogized closely to an injunction proceeding, where the property rights of individuals

are concerned, and where the preserving them or holding them in statu quo until a jury trial is a matter of consideration. While some analogy may be drawn between the two proceedings, they are yet quite dissimilar. The purpose of the act of 1911 was to avoid lynching or other violence, or the danger thereof. It was a provision for greater certainty in upholding the integrity and majesty of law. In providing for the administration of justice the great State of Georgia has declared that it should be done in a just and impartial way, and that the trial should be removed to another venue whenever it is reasonably shown that there is such danger. It is not a mere matter of judicial discretion, as in the case of an injunction, but a matter of statutory duty. Where time and opportunity and the circumstances are such that the judge may fairly have a hearing without causing the very danger sought to be prevented, he can do so. But we can not destroy the efficacy of the stern mandate of this act by merely holding that the judge can first refuse a change of venue on uncontradicted evidence showing its necessity, and that the only effect of such refusal, upon exception to this court, is to send the case back on the possibility that he may hear some evidence adverse to the change.

No point was made in the bill of exceptions or the record that the court did not grant a rule nisi or set the case for a hearing. The exception was that he did pass on the uncontradicted evidence, and ruled wrongly. The exception is not like one to the refusal to grant a rule nisi or the like in ordinary civil cases. The act is one to meet emergencies for the purpose of saving life and insuring a fair trial.

The solicitor-general in his brief made a number of statements of facts outside of the record, which can not, of course, be considered.

Upon a careful consideration of the entire matter the majority of the court are of the opinion that the judgment should be reversed, with direction to the presiding judge to grant the change of venue.     *Judgment reversed. All the Justices concur, except*

EVANS, P. J., and BECK, J., dissenting. We agree with the opinion of the majority of the court that under the evidence a change of venue should have been granted, but we dissent from the direction given to the case. It is our opinion, taking into consideration the purposes of the act, that the proper course would be

to remand the case with the direction that a new hearing be had, at which opportunity should be given to the solicitor-general to submit proof as to whether the fears of mob violence expressed in the petition were in point of fact reasonable. According to our conception of the act, the legislature intended to provided for two conditions: First, where a defendant is threatened with mob violence and the judge from a knowledge of the local situation has a reasonable apprehension of mob violence, it is his duty, whether a petition is filed or not, to grant a change of venue. That is to say, if the judge, from information which he has, is of the opinion that such an emergent condition exists that the prisoner will be lynched or suffer other violence, it would be his duty to grant a change of venue without hearing any evidence. On the other hand, if his information be of such a character as to be insufficient to create a reasonable apprehension of danger of mob violence against the prisoner, he should fix a time and place for hearing, in order that the prisoner and the prosecution may submit evidence on that subject. The act refers to an interlocutory hearing. A judicial hearing can only be had when both sides to the controversy are given an opportunity to be heard. It is the necessary implication of the act that, when the court determines that a hearing is necessary, both sides should be allowed to submit testimony. In the instant case the court rendered judgment upon an ex parte hearing. That judgment is erroneous. Most probably the court considered the evidence insufficient to show a reasonable apprehension of mob violence, inasmuch as the only proof offered in support of the petition consisted of two affidavits in which the affiants' asseverations of threats against the prisoner were not specific, but of the most general character. Such threats were alleged to have been made on the day the prisoner shot his wife. He had been incarcerated in the local jail for twenty days after such threats were made, and during this time no effort was made to carry them into effect. Under these circumstances, the case should be remanded for an immediate hearing, in order that the judge might gain at such hearing more full and accurate information as to the real state of public sentiment towards the prisoner's safety in the event that he be brought back to the county for trial.