### GRAHAM *v.* THE STATE.

Under the allegations of the petition for a change of venue on the ground that there was danger of lynching or violence in the county where the crime was alleged to have been committed, the evidence introduced in support thereof, the failure on the part of the State to deny or rebut allegations and evidence of what transpired between a mob and the sheriff of the county after the homicide and shortly before the petition was made, and in the light of the entire evidence, it was error to refuse to grant a change of venue.

JUNE 12, 1914.

Application to change venue.   Before Judge Quincey.   Coffee superior court.   April 7, 1914.

Charlie Graham was charged with the offense of murder, and incarcerated in the county jail of Coffee county.   On April 6, 1914, he made a motion for a change of venue, under the act of August 21, 1911 (Acts 1911, p. 74).   The motion was verified by the oath of the movant, and showed in substance as follows:   Petitioner was arrested and imprisoned on the charge of murdering one Lawrence Newbern and one Lester Graham in the city of Broxton, Coffee county, on the night of March 21, 1914, the two being killed at the same time and place.   An indictment has been returned, charging petitioner with killing each of the persons named.   The presiding judge has called a special term of the superior court to convene on April 6, 1914, and it is now in session, for the purpose of trying certain criminal cases, and particularly the one against petitioner; and it is the purpose of the court to try petitioner immediately on one or both of the charges of murder.   Lawrence Newbern, one of the men whom the petitioner is charged with murdering, was a man well known and of large influence, having many influential friends, relatives, and acquaintances residing in every part of the county.   Petitioner was reared in another county, and is practically unknown in Coffee county.   Ever since the alleged murder was committed there has existed and still exists against

him in the county the most intense hatred, prejudice, bitterness, and malice; and this feeling is general and possessed by a large number of the citizens. Ever since the alleged murder there have been constant and numerous threats by a large number of citizens of the county to lynch petitioner; there exists the strongest kind of determination to lynch him at sight, and his life is in serious and grave danger, by reason of the fact that there is danger of his being taken out and hung by a mob. He has been advised that a large body of citizens of the county have formed themselves together for the purpose of lynching him, and that they merely await an opportunity for that purpose. At the time of his arrest, which occurred only a few days before the making of the motion, open threats were made in his presence to immediately lynch him, and certain infuriated citizens would have done so at that time, save for the action of a former sheriff in hurrying him from the place of arrest to the jail, twelve miles distant. At the time of the arrest he was immediately hurried to the jail before any considerable number of people were aware of the arrest and before it was possible for a mob to form and lynch him. The jail is located in the city of Douglas, more than 10 miles from the scene of the alleged murder. "On the same night of his arrest and so soon thereafter as it became generally known that he had been arrested and placed in jail, a large assembly of citizens gathered in said town of Broxton and formed a company for the purpose of coming to Douglas and taking your petitioner out of said jail and taking his life. That said purpose was only abandoned at that particular time because of the fact that the sheriff of Coffee county learned of said intention, and before said crowd left Broxton he got in communication by telephone with some parties at said place and promised, that if the crowd would disperse and not attempt to lynch your petitioner, that a special term of the superior court of Coffee county would be called immediately, and that your petitioner should be tried at said term, and that the severest penalty known to the law would be meted out to him. Your petitioner states that said promise on the part of said sheriff that an immediate term of said court should be called and this petitioner tried, convicted, and sentenced to death is all that saved him from having been lynched on the occasion mentioned. Petitioner states that he was spared from lynching purely on the belief that he would be immediately tried

and hanged; and your petitioner now states that he is completely handicapped in the preparation of any defense against said charges of murder, and that, under the conditions existing and that will exist on the trial of his case at said special term called as aforesaid to try your petitioner, it is and will be useless for him to attempt any defense to same, though he has a good defense, in that should he defend against said charge or charges, and as a result of same he should receive a sentence of less than death, he would immediately be lynched, so that it only resolves itself into a matter of discretionary choice with your petitioner as to whether he shall forego that constitutional privilege and permit a verdict of guilty and judgment of death and thus end the predicament that faces him." He is informed and believes that the sentiment is so bitter against him that he will be taken by violence on the first occasion when he is presented to the general public view, and that such occasion will be afforded if he is placed on trial or brought into the superior court of Coffee county for public trial.

The solicitor-general on behalf of the State made no formal answer to the petition, but introduced affidavits in opposition to it. On behalf of petitioner, affidavits were introduced from six residents of the county, who deposed to the effect that they had talked with and heard many citizens discuss the killing; that sentiment against the petitioner was very bitter and inflamed; that in their opinion it would be dangerous for him to be tried in Coffee county, and there would be danger that he would be lynched unless granted a change of venue, and he would be lynched if he should make a fight for his life on the trial and be in any manner successful. One of the deponents stated that the friends and acquaintances of Newbern, one of the deceased men, were determined that Graham should pay the penalty of death for the alleged murder, either from the gallows or by mob violence.

A sister of the petitioner deposed, that she lived about three miles from the town of Broxton, where the killing occurred, but it was not generally known that she was the sister of the petitioner; that the killing took place on the night of March 21, and on the following morning a number of people from in and around Broxton came to her house to search for Graham; that some of those present stated that there were about seventy-five of them searching every pig-path for Graham, that they would catch him and he would

never see Broxton again, and that they had no idea that there would be anything but pieces left of him within five minutes after he was found; that they further stated that Graham had killed a good man and must pay for the crime; and one of them stated that he had shot at Graham the night before, and thought he had hit Graham in the leg, and was only sorry that it was not in the head; that after her brother was placed in jail she had made several trips to Douglas by railroad, and on nearly every occasion she was forced to hear the most terrible threats of vengeance against him; that only a few days before she made the affidavit she had heard one of several persons who were talking about the case say that there could be 500 people gotten together in a few minutes, who would be willing to lynch Graham, and he had to hang one way or another, and must die for the crime he had committed; and that she had heard from several sources that a crowd was made up at Broxton on the night of the arrest, for the purpose of going to Douglas to lynch Graham, but that, under a promise from the sheriff that court would be called at once and that Graham would be "legally hung" they agreed to wait until they could see whether he would be hung or not.

A brother of petitioner deposed, among other things, as follows: He has seen and talked with a large number of the citizens of the county, and is thoroughly familiar with the sentiment of the county regarding the killing. It is in a very excited condition, and a general feeling of hatred and malice prevails toward petitioner. He finds a strong current of opinion in favor of denying petitioner a trial at all, and a desire that he be taken from the jail and lynched. He finds another current of opinion and feeling that if petitioner be tried immediately at the term of court called for that purpose, it would be all right, provided the defendant did not insist on making a strong defense and would practically plead guilty, so that the sentence of death would be rendered against him; and the general desire is that petitioner be punished with death, either by hanging or mob violence. In a conversation the sheriff of Coffee county stated to the affiant that the petitioner would have already been lynched were it not for the fact that the sheriff promised the mob then assembled that if they would "defer" the lynching he would have a special term of court to be immediately called for the purpose of trying petitioner, and that the latter's neck would then

be broken. The sheriff further stated to the affiant, in the presence of petitioner and his mother, that petitioner would die for this offense, that there was no way for him to escape death, that it would be the duty of the sheriff to perform the act, and that he did not want the affiant to think hard of the sheriff for so doing. In the town of Broxton, on the day when this affidavit was made, affiant heard a party make the statement that petitioner would either be lynched or hung, that he would positively meet the one fate or the other, and that if the court did not hang him the mob would certainly do so. On one occasion, a day or two before the making of the affidavit, affiant was in the town of Broxton with his mother and sister, and he noticed a crowd of ten or fifteen men standing together, watching him and apparently engaged in a whispered conversation. One of them, whose name the affiant did not know, stepped up to him and asked if he were not a brother of the Graham who did the killing, and, on his answering in the affirmative, told him that there was constant talk of lynching his brother, and that they (indicating the crowd) were going to run the affiant out of Broxton. The person speaking came to him as a friend, saying that he was going to take no part in it, but that the affiant had better watch his course and "look out," and that his brother would be lynched for the killing. On the day this affidavit was made another person had told him that the speaker knew 500 people in favor of lynching petitioner without a trial, where he knew of none who would be willing for him to get a fair trial.

In opposition to the motion, counsel for the State introduced the affidavits of thirteen persons, in substance as follows: They are citizens of the county, and are acquainted with the fact that during the latter part of March Charlie Graham was incarcerated in the county jail on the charge of murder, and has since so remained. Since he has been incarcerated they have heard of no attempt of mob violence or lynching threatened against him, and they are of the opinion that no violence will be done to petitioner, but on the contrary it seems to be the consensus of opinion of the people with whom the affiants have talked that petitioner should be accorded a fair and impartial trial by a fair and impartial jury. They are acquainted with a great many citizens of the county, and have talked with a good many of them, and have heard no person express himself as being in favor of lynching petitioner or of doing mob

violence to him. Affidavits of the ordinary and the clerk of the superior court were to the effect, that since the incarceration of petitioner no attempt has been made to lynch him or do violence to him; that they are acquainted with many people in the county, and have conversed with a number of them; that they have heard of no threats of violence; that in their opinion there is no danger or probability of any attempt to lynch or do violence to petitioner; and that they are well acquainted with the jurors of the county, and believe that petitioner would have a fair and impartial trial if he be put on trial in that county. A similar affidavit was made by the solicitor of the city court, who deposed that he was actively engaged in a campaign for re-election, and had talked with many people in different parts of the county.

The sheriff made an affidavit in substance as follows: He is in charge of the jail in which petitioner has been incarcerated since his arrest on March 22. During that time there has been no effort by any person to do violence to petitioner. Deponent has heard no party make any threats of violence or lynching toward the defendant. A great many people have been to the jail to see defendant, and deponent has heard no person threaten violence toward him, but on the contrary the consensus of opinion among the people with whom affiant has talked seems to be in favor of letting the law take its course. In deponent's opinion the defendant can get a fair and impartial trial before a jury in Coffee county.

The presiding judge did not issue a formal rule nisi, but heard the motion on the next day after it was made, the State and the movant being both represented, and each side introducing evidence. The motion was overruled, and the petitioner excepted.

*T. A. Wallace,* for plaintiff in error.

*M. D. Dickerson, solicitor-general,* and *McDonald & Willingham,* contra.

Fish, C. J. (After stating the foregoing facts.) This was a petition for a change of venue under the act of August 21, 1911 (Acts 1911, p. 74), on the ground that there was probability or danger of lynching or other violence being perpetrated upon the petitioner, who was accused of murder. That act undertook to accomplish what the legislature considered a wise purpose. It is the duty of the courts to give it proper effect. It did not leave the matter of changing venue, on the ground stated, as a mere matter

of discretion on the part of the presiding judge, but declared that the judge of the superior court of the circuit in which a crime was alleged to have been committed should be authorized to change the venue for the trial of the case on his own motion, with or without petition, whenever in his judgment the accused party will be lynched or there is danger of violence being attempted to be committed upon him if carried back, or allowed to remain in the county where the crime is alleged to have been committed. So far the language might be treated as only of authorization; but the act goes further. It declares that if a motion by petition shall be made for a change of venue, the judge shall hear it at chambers at such time and place as he may direct. "And if the evidence submitted' shall reasonably show that there is probability or danger of lynching, or other violence, then it shall be mandatory on said judge to change the venue to such county in the State as, in his judgment, will avoid such lynching." This is not the language of permission or of discretionary authorization, but is a statutory command, and the legislature emphasized that fact and saw fit to declare that, if it should be reasonably shown that there was a probability or danger of lynching or other violence, "it shall be mandatory" on the judge to change the venue. *Kennedy* v. *State,* 141 *Ga.* 314 (80 S. E. 1012). It is, of course, true that the presiding judge must primarily pass upon the question of fact as to whether it is reasonably shown that there is such danger, and that this court will not reverse his finding upon conflicting evidence unless it is manifestly erroneous. *Wilburn* v. *State,* 140 *Ga.* 138 (78 S. E. 819). But the language of the statute showing the change in the duty of the judge of the superior court on this subject, removing the action from the domain of his discretion, and providing for a speedy review of his finding by this court, did not contemplate that such a review should be merely perfunctory, and that if any citizen or county official would state that he had not heard of any intended lynching, or would express the opinion that he thought there was no danger, this court should, as a matter of course, affirm the judgment. If such is to be the construction placed upon the statute, its efficacy will be destroyed. Probably no application for a change of venue under the act now being considered will ever be made where some good citizens of the county can not be found who can truthfully swear that they do not know of the contemplated or in-

tended lynching and who do not think it likely to occur. This court does not primarily pass upon questions of fact; but if the judge of the superior court violates his duty and manifestly errs in his judgment under the evidence, this court can interfere as matter of law.

While the opinion evidence in this case in conflicting, there is no conflict as to the fact that a mob was formed for the purpose of doing violence to petitioner, and that they hunted for him for that purpose. Moreover, the written and verified motion for a change of venue alleged that a lynching was only prevented by a promise on the part of the sheriff to the mob that a special term of the superior court would be called immediately, and that petitioner should be tried at that term and the severest penalty known to the law would be meted out to him. The hearing was had on the day following the making of the petition. The sister of petitioner stated in her affidavit that she had heard this from several sources. The brother of petitioner made affidavit that the sheriff stated to him that petitioner would have been lynched already were it not for the fact that he promised the mob then assembled "that if they would defer said lynching" the sheriff would cause a special term of the court to be immediately called for the purpose of trying petitioner, "and that his neck would then be broken." Counsel for the State evidently had due notice of the petition, because he was present at the hearing and opposed it, and the order overruling it recites that the motion came on regularly to be heard. An affidavit from the sheriff was introduced in evidence, in opposition to the motion, in which he failed entirely to deny or make any mention of the statements in the motion and in the affidavits of the brother and sister of the petitioner. He did state that during the time of the incarceration of petitioner there had been no effort made by any person to do violence to him, that he had heard no party make any threats of violence or lynching (apparently since the incarceration), and that the consensus of opinion among the people with whom he had talked seemed to be in favor of "letting the law take its course." Where a direct charge was made that a mob had been formed to lynch petitioner, that the sheriff procured them to "defer" the lynching on the promise of an immediate conviction and that petitioner should be "lawfully hung," and that the sheriff had stated that petitioner would have been lynched before the petition for change of venue was made but for this promise, the silence of the

sheriff and of counsel for the State on this subject is most significant. Here we have evidence, not of opinion, but tending to show the direct fact of a preparation to lynch petitioner, which was deferred on the promise of the sheriff that petitioner should be "lawfully hung;" and this evidence is unanswered. If there was an intention to lynch petitioner, it is not very probable that the persons contemplating such an action would communicate their intentions in advance to the officials. Furthermore, there is evidence that since this arrangement between the sheriff and the mob had been agreed upon, various persons had stated that petitioner should be hung by law or be lynched. It may be said that the sheriff could not make a binding contract of that character. Of course this is true, but the mob seemed to have merely delayed to see whether the agreement of the sheriff would be consummated. The mere fact that no effort was made to break into the jail or do violence to petitioner during the time of his incarceration before the present petition was heard is not sufficient to answer the evidence above stated. The homicide occurred on the night of March 21, at Broxton, and after it petitioner was arrested and carried to jail at Douglas, about 12 miles away. According to the evidence above stated, the sheriff induced the mob to delay action. A special term of court was called very promptly, and was in session on April 6, and apparently the trial was near at hand when this petition was presented. The sheriff could not call the term of court, but one was called as he predicted, and the fact that the mob had delayed action during this short time while petitioner was in jail is not sufficient to show that he was in no danger of violence when he should be taken out of jail, especially if he should present a strong defense or if he should be successful in obtaining a less sentence than death.

Under the evidence we think it is manifest that it did reasonably appear that there was danger of lynching or violence, and that the rebutting evidence on behalf of the State failed to meet that which was most material on behalf of petitioner. The sheriff not only failed to deny the agreement with the mob that petitioner set up, but he did not even state that the people with whom he had since talked and who were in favor of letting the law take its course were those who had been previously gathered together to lynch petitioner, or that they or any of them had abandoned that purpose perma-

nently and unconditionally. We therefore think that the presiding judge manifestly erred in refusing to grant a change of venue.

*Judgment reversed. All the Justices concur, except .*

EVANS, P. J., and BECK, J., dissenting. We dissent from the opinion of the majority of the court. The act of 1911 contemplated that whenever an application was made for a change of venue on the ground that there was a probability or danger of lynching or other violence being perpetrated upon the applicant, there should be a hearing before the trial judge. His judgment is predicated upon the evidence, and this court has no constitutional power to reverse that judgment unless it is manifestly apparent that the trial judge has abused his discretion. We do not think the facts in this case show such abuse of discretion.

It very frequently happens that when a homicide is committed the relatives and friends of the slain man are moved at the time to a high pitch of resentment against the slayer, and give expressions to that resentment. Just after a killing, not infrequently the people in the community are brought together by a report of the homicide, induced largely by curiosity and a desire to get information respecting the killing. It may be that some one in that gathering may utter inflammatory remarks, but it does not follow that the whole gathering is to be regarded as a mob thirsting for vengeance.

The proof submitted before the judge by the applicant in support of his motion is in the affidavits of a few men who state that they have heard expressions from citizens of resentment against the accused, and that in their opinion the defendant is in danger of mob violence. One of these witnesses stated that the friends and acquaintances of one of the men alleged to have been killed by the applicant had stated that they were determined that applicant should pay the penalty of death, either on the gallows or by mob violence. The brother and sister of the applicant testified in highly extravagant language, based largely upon their deductions and fears, that applicant is in danger of mob violence. Against this testimony it is shown that about two weeks have elapsed since the arrest of the applicant and his confinement in the county jail. During this period of time people have visited the jail as usual, and there has been no manifestation of a mob spirit or prejudice against the applicant, who is there confined. The officers of the county and many substantial citizens, who had opportunity of knowing the

public sentiment towards applicant, deposed that they had heard no expressions of any intent to do mob violence to the applicant, or that he can not have a fair and impartial trial in the county. The trial judge was nearer the scene and better acquainted with the temper of the people than this court. He was better prepared to pass upon the credibility of the witnesses; and we think the testimony is ample to support the conclusion that the applicant is not in any danger of mob violence, and, if tried in the county of the alleged homicide, will receive a fair and impartial trial.