23230. JOHNS *v.* THE STATE.

Decided May 27, 1933.

J. D. *Braswell*, G. *Wilbur Sweat*, Harry M. *Wilson*, Herbert W. *Wilson*, for plaintiff in error.

*A. B. Spence, solicitor-general, John S. Gibson, A. S. McQueen,* contra.

MacIntyre, J. Royal Johns was indicted for the crime of murder. He presented a petition to the judge of the superior court of the circuit which embraces the county where the alleged crime was committed. This petition contained two grounds: (1) that the petitioner could not obtain a fair and impartial jury in Charlton county; and (2) that there was a probability or danger of lynching, or other violence. After hearing the evidence, the judge refused to grant the change of venue. To this judgment the defendant excepted.

Mrs. Royal Johns, the wife of the defendant, testified in part that on the day on which the defendant was arrested, sheriff Sikes and six or seven men, among them a Mr. Stokes, a detective, went to the home of the defendant to make an investigation; that they had double-barrel shotguns, and pistols; that they found the defendant sitting in some high grass in a field near the back-yard; that they told him to hold up his hands, and that when he raised his hands there was nothing in them; that "they ordered the sheriff to go and get the handcuffs and put on him, and cursed him and told him to put his hands over his head;" that "there were three or four shots at that time;" that the shooting was done by Mr. Stokes or Mr. Thomas; that after they had arrested and handcuffed him, and carried him to the car, Mr. Stokes again cursed him; that when witness was carried to jail she left all her belongings, except "only just a few I taken with me;" that sheriff Sikes carried the children to the defendant's mother; that the house was "fastened up when I left—no one had moved in there since that I know of;" and that on the next Thursday night, after she was put in jail, the house and its contents were destroyed by fire.

Oscar Johns, brother of the defendant, testified, in part, that he was acquainted with the jail in Waycross; that he had broken out of this jail; that the "condemned cell was made of steel:" that "there is only one window in that cell;" that "the window is encased with bars and then sheet-slats on the outside," and "the door is made of sheet-steel;" and that "I imagine a fellow would have a pretty hard time getting out of that jail."

It appears from the record that both the State and the accused agreed that the defendant was in the cell described above; that Os-

car Johns was in jail in Blackshear, Pierce county, Georgia; that Mrs. Royal Johns was in jail at Folkston, and that the defendant, Oscar Johns, and Mrs. Royal Johns were charged with the same offense.

Walter Crews, a brother-in-law of the defendant, testified, in part, that in the presence of the sheriff, the detective Stokes said to him: "We got him in the Waycross jail now . . I don't expect we will ever get him [defendant] back to Folkston to try him nohow;" that witness had "heard this case talked about a whole lot," but did not know that he could "just give the name of any certain one," except Lewis Thrift, who lived in another county; that Lewis Thrift said, "day before yesterday," "If he is guilty I hope he will get justice, and if he is not guilty I hope he will get justice;" that Buddy Crews said: "I heard a lot of people say that they were aiming to electrocute Royal Johns for it," but that he, Buddy Crews, did not think that they had evidence enough to convict him, unless they had some more than he had heard of; that Mr. Strain said that he did not believe they had evidence enough to convict him, unless they had more than he had heard of; and that Strain and Crews lived in Charlton county.

Mathew Williams testified, in part, that he "heard it talked that they thought Royal Johns ought to be lynched," but that he "just heard it talked around," and did not know who said it; that he heard people in Charlton county "around the neighborhood talking it." Here the court propounded this question to the witness: "Who did you hear say that?" The witness replied: "Why, I don't know; I heard some talk of it right here in town. Oh, I couldn't say who I heard say it here. No, I wouldn't state that I could name one that said anything about it, that I had a talk with. What I know about it, I just caught it through others. Yes, it was in a crowd that I heard that statement; other people were talking and I just caught it. Yes, they were Charlton county citizens right here in Folkston; . . I am not afraid to tell who these parties are. If I was to recollect who it was, I wouldn't mind telling it."

Andrew Strain testified, in part, that he had heard some "expression" about hanging or lynching the defendant by citizens of Charlton county, "a good many times;" that "a heap of them was against the defendant;" that he could not say whether or not the

expressions referred to were recent, but that he heard them all along—heard people say that he should be electrocuted—heard people use both expressions—that he should be lynched and should be electrocuted; that he could not say where these statements were made, in whose house or what town, or whether they were made during the day or night; that he could not name a single person who made these statements. This witness concluded his testimony in this language: "From all I have heard about this matter, I wouldn't say that he would get a fair trial, sir, and I wouldn't say that he wouldn't."

Josh Warren testified, in part, that he heard some of the people in Homeland, Charlton County, say the next morning after the killing that "they ought to lynch Mr. Royal Johns when they caught him;" that this was while Mr. White was a corpse, and that "it was the people that was over there to see Mr. White." This witness further swore that he did not "know how many people were in the crowd" when he heard the statement, but that he thought there were twenty-five or thirty; that he "heard this statement a right smart while Mr. White was there a corpse," and "heard it a few times since the killing;" that he knew most of the people in Homeland, but could not tell the name of any one who made such statement.

Cliff Boddy testified, in part: "I haven't heard any talk generally against Royal Johns since the killing, not in Georgia." The witness further testified that on Friday night after the killing on Tuesday he heard Walter Way, who was not a citizen of Georgia, say: "The defendant ought to be lynched;" and that this statement was made at a place eight miles beyond the Georgia line, and about twelve miles from Folkston.

D. J. Parrish testified, in part, that he was arrested as a suspect for the same crime; that he had been in jail in Charlton county; that one or two days after the killing they took him over to the court-house and told him that "they just wanted me to get up and tell the true facts, if I knowed it; that the evidence was leading towards me, and I would undoubtedly know more, and if I did know more, to tell the truth about it—be honest and tell the truth about it—that's what they would ask me every time." The witness further swore: "No, sir, they didn't tell me they would lynch me. . . I said it looked . . like . . a lynching mob. They . .

didn't mistreat me at all, only asked me for the truth. They says, 'I will give you till tomorrow night to think over this thing and get up the true facts.' That is as far as they went. They never did tell me about lynching. . . Some of them, I think, did state that if I didn't tell the truth, they would take me for a ride. The lights went out on the court-house two or three times that night, flashing around. I got struck in the head there. As to who hit me, the room was crowded and it wasn't really a lick intended, I don't think. No, sir. . . I don't know what caused the lights to go out; there was nobody cut them off. . . "

The State made a counter-showing, introducing twenty witnesses from various sections of the county, all of whom testified substantially that the defendant could get a fair and impartial trial in Charlton county, and that they had heard of no threats of lynching or of violence against the defendant. Sheriff Sikes further testified, in part, that Mr. Stokes never told the witness Crews that "perhaps Johns would be lynched, or he couldn't get him here for trial;" that "no such remark was made, or anything that could be construed into it;" that there was no cursing at the time, but that there was cursing back of the house where Mr. Johns was found; that Mr. Thomas and Mr. Johns "passed" a vile oath "back a time or two between them;" that Mr. Johns didn't have a gun, but that some of the sheriff's party behind witness did some shooting; that they were trying to make him hold his hands up higher and did not shoot directly at him or try to hit him; that witness was at the court-house on the night referred to by defendant's witness Parrish; that "it was raining, there was some lightning, and the lights went out all over town;" that they went off once or twice, and "they went off and stayed off a good long time;" that "Mr. Parrish was not mistreated, nor were any threats made against him while he was being examined;" that witness did not hear any one "threaten to take him to ride;" never heard him say a word about being hit; that witness was present, but "if anybody hit him," he did not know about it; that there were four defendants charged with this crime; that two of them were confined in the jail at Folkston, another was placed in jail at Blackshear, and that the defendant, Johns, was carried to the jail at Waycross; that witness sent said parties to different places because one fellow told him that Johns had "some keys that were supposed to be to some jail—he didn't know what

jail—it might have been this jail, for he [Johns] was in this county," and because he "didn't have room to take them all here and keep them without putting them all right together;" that after he got the information that the defendant had keys to the jail he searched his place and found some keys and some patterns for keys; that "among the keys was one too big for an ordinary lock;" that said key "must have been made for a jail;" that witness "found the keys sewed up in the middle of a pillow;" and that witness had heard of no organized effort to do violence to the defendant.

J. S. Stokes testified, in part, that he was a detective employed to assist the sheriff in working up the evidence in the case; that he was present when Mr. Johns was arrested; that "we commanded him to hold up his hands several times," and "he refused to hold them up;" that witness "fired two and a half or three feet to the right of him" because he was slow in putting up his hands; that witness said: "I may have said 'damn it, throw them up,'" but that he did not say this after the arrest and his return to the car; and that he had never made the statement that, "while we had Mr. Johns, I did not believe we would ever get to court with him."

F. B. Mills testified, in part, that "some of the people I talked with said they thought Mr. Johns was the man that committed the crime—I heard practically nothing in behalf of Mr. Johns;" and that witness was a cousin of the defendant.

L. E. Mallard testified, in part, that the deceased, White, had no relatives in Charlton county; that "the discussion was along the line of the fact that the evidence [as it appeared at the coroner's inquest] tended to show that it was Mr. Johns that did the killings;" and that all of the people he talked to had not made up their minds, but some of them had.

W. D. Thompson testified, in part, that he had heard a policeman express the opinion that from the evidence "they had," he thought Mr. Johns was guilty; and that witness had heard some of the "folks" express their opinion that Johns did the killing and was guilty.

W. R. Wainright testified, in part, that he attended the funeral of the deceased, White, and that he did not hear the case discussed there at all.

Before the passage of the act of 1895, it was necessary for the judge to examine all the jurors in the jury-box before the venue

64

could be changed to another county. After the passage of that act it became the duty of the judge, on motion, to change the venue, if, after hearing the evidence, he was satisfied that an impartial jury could not be obtained in the county. This, in effect, left the matter to the sound discretion of the judge. The legislature evidently thought that these statutes should be strengthened in order to lessen lynchings and other acts of violence. Accordingly, a statute was passed August 21, 1911 (Ga. L. 1911, p. 74; Michie's Code (1926), § 964), commanding, not merely permitting, a change of venue if it should be "reasonably shown that there is probability or danger of lynching, or other violence." The part of the act of 1911 applicable to this case reads as follows: "and if the evidence submitted shall reasonably show that there is probability or danger of lynching, or other violence, then it shall be mandatory on said judge to change the venue to such county in the State as in his judgment will avoid such lynching." In the language of the late Chief Justice Fish in the case of *Graham* v. *State,* 141 *Ga.* 812, 817 (82 S. E. 282), "That act undertook to accomplish what the legislature considered a wise purpose. It is the duty of the courts to give it proper effect."

It takes more evidence to sustain ground 1 of the petition than it does to sustain ground 2. With reference to ground 1, the judge, in order to change the venue, should be "satisfied that an impartial jury can not be obtained to try the case. . . " To be satisfied by evidence means that there must be clear and convincing evidence: it requires more than a preponderence of evidence. Under ground 2, if the evidence reasonably shows that there is a probability of lynching, or other violence, then it shall be mandatory upon the judge to change the venue. Probability is defined as likelihood or appearance, a resemblance of truth founded upon reason. In ordinary language the word implies doubt. See Webster's Dictionary; Black's Law Dictionary; Century Dictionary. When the statute under consideration commands that the judge act on probabilities, it means simply that he "acts on less than convincing evidence." Ballantine's Law Dictionary. In legal effect, it means that if there is a greater weight of evidence in support of the petition for a change of venue than to the contrary, if the evidence inclines the mind to belief but leaves some room for doubt, and yet is sufficient to incline a reasonable and impartial mind to the movant's

side of the issue rather than to the other, the motion for change of venue should be granted. It does not mean that the judge's mind shall be free from uncertainty and doubt. Again, the late Chief Justice Fish said in *Graham* v. *State,* (supra) : "But the language of the statute showing the change in the duty of the judge of the superior court on this subject, removing the action from the domain of his discretion, and providing for a speedy review of his finding by this court, did not contemplate that such a review should be merely perfunctory, and that if any citizen or county official would state that he had not heard of any intended lynching, or would express the opinion that he thought there was no danger, this court should, as a matter of course, affirm the judgment. If such is to be the construction placed upon the statute, its efficacy will be destroyed. Probably no application for a change of venue under the act now being considered will ever be made where some good citizens of the county can not be found who can truthfully swear that they do not know of the contemplated or intended lynching and who do not think it likely to occur. This court does not primarily pass upon questions of fact; but if the judge of the superior court violates his duty and manifestly errs in his judgment under the evidence, this court can interfere as matter of law."

The evidence in this case does not show any threat or any organized effort to undertake to do violence to the defendant. Some of the defendant's witnesses stated that they had heard some such expressions as "Royal Johns ought to be lynched," "Royal Johns should be electrocuted and lynched," "they ought to be lynched." No one said that he was going to help lynch the defendant, or that there was any organized effort to undertake to do any violence to him, or that there was actually any threat to do him violence. Although asked to do so, the defendant's witnesses did not give the name of any person who made such statement, except in a few instances, and in the instance given there was contradictory evidence. Crews, the brother-in-law of the defendant, did say that Stokes made the statement in the presence of the sheriff: "I don't know whether we will ever get him [defendant] back to Folkston to try him nohow." The sheriff and Stokes both denied that this statement was ever made. The defendant's witness Warren, who used some of the expressions quoted above, closed his testimony by saying that from what he had heard he would not say whether or not

the defendant would get a fair trial. The witness Parrish, who was held as a suspect, testified that he was taken from the jail to the court-house of Charlton county, where, upon being examined, he was told that he knew more than he had already told, and that "they wanted him to tell the whole truth;" that "it looked like a lynching mob," but that they did not tell him they would lynch him, but some of them, he thought, said that if he "didn't tell the truth they would take" him "for a ride;" that the lights went out and he got struck on the head, but that he did not think the lick was intended; that he didn't know what caused the lights to go out— that no one cut them off; and that he was not mistreated. The sheriff stated, with reference to this incident, that he was present; that there was raining and lightning; that "the lights went out all over town and stayed out for a good while;" that he did not hear any one threaten to take Parrish "for a ride;" that he "never heard him [Parrish] say a word about being hit;" that if anybody hit him, witness did not know of it; and that no threats were made against Parrish.

The first ground of the motion for a change of venue being discretionary, we can not say that, under the evidence, the judge abused his discretion in deciding that issue adversely to the defendant. As to the second ground, not only was the opinion evidence conflicting, but the evidence as to other material facts was also conflicting; and, under the law as it is written, this court is not authorized to reverse the judge's finding upon conflicting evidence unless it is manifestly erroneous. *Wilburn* v. *State,* 140 *Ga.* 138 (78 S. E. 819) ; *Graham* v. *State,* supra. The instant case is distinguished from *Bivins* v. *State,* 145 *Ga.* 416 (89 S. E. 370) ; *Kennedy* v. *State,* 141 *Ga.* 314 (80 S. E. 1012), and the *Graham* case, supra, in that in all of these cases it was undisputed that a mob was threatening to lynch the defendant, and that there were other undisputed circumstances showing that concerted action was being taken to do violence to the defendant. The able trial judge was on the ground, considered all the facts and circumstances of the case, saw the witnesses' manner of testifying, and resolved the issues of fact upon conflicting evidence against the defendant. We can not say that it was too clear and certain to admit of dispute— that it did reasonably appear that there was a probability of lynching or other violence.

The movant objected to the introduction in evidence of certain keys and patterns of keys on the ground that the evidence was obtained by illegal search. "Articles taken from the person or premises of the accused, tending to establish his guilt of the offense of which he is charged, are admissible in evidence against him, notwithstanding the articles were discovered by an unlawful search and seizure; and this rule of evidence is not violative of the constitutional prohibition of unreasonable searches and seizures." *Calhoun* v. *State,* 144 *Ga.* 679 (2) (87 S. E. 893). See also *Duren* v. *Thomasville,* 125 *Ga.* 1 (53 S. E. 814); *Williams* v. *State,* 100 *Ga.* 511 (28 S. E. 624, 39 L. R. A. 269). There is no merit in this ground.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*