## BIVINS *v.* THE STATE.

The judge erred in rendering the judgment refusing a change of venue.
JUNE 27, 1916.

Motion to change venue.   Before Judge George.   Crisp superior court.   March 14, 1916.

*E. F. Strozier,* for plaintiff in error.   *J. B. Wall, solicitor-general, J. T. Hill,* and *Jesse Grantham,* contra.

FISH, C. J.   This is a motion for change of venue under the act of 1911.   From the petition it appears:   At the spring term, 1915, of the superior court of Crisp county, Honor Bivins was indicted and tried on the charge of being accessory before the fact to murder.   There was a verdict of guilty; he was refused a new trial, and on a bill of exceptions to this court, assigning error upon such refusal, the judgment of the trial court was reversed.   It appears that T. E. Gleaton, the person alleged to have been murdered was, at the time he was killed, treasurer of Crisp county and a citizen of much prominence.

The evidence submitted on the hearing of the motion for change of venue very strongly tended to establish the fact that during the trial of the accused (about a year prior to the hearing of the motion) there was imminent danger that he would be lynched; indeed, it seems that this fact was not seriously controverted by the State on the hearing under review.   Two members of the bar of Crisp county, who were in no wise connected with the case, joined in an affidavit put in evidence in behalf of the movant, from which we quote as follows:   "During the progress of the trial the court-room was crowded to an unusual degree, and to its full capacity, by persons from all parts of the county, and that

this crowd remained during the entire trial. Affiants say that it was common talk about the court-house, and about the streets on that occasion, that the defendant would be lynched, especially if the jury failed to agree, or returned a verdict other than that of guilty. Affiants say that the jury remained out all the afternoon deliberating upon the case, and, as the afternoon advanced, groups of men gathered about the jail where the defendant was confined, and remained there. About six o'clock in the evening the court adjourned for the day, but the crowd still remained in and around the court-house and jail. About eight or eight-thirty o'clock at night the attitude of the crowd became so threatening that the judge was sent for, as well as a number of citizens who, at the time, were assembled at one of the churches. Affiants say that upon arrival the judge made a speech to the crowd assembled in the court-room, in which he asked that the law be allowed to take its course, and assuring them that in the event the jury failed to agree by morning he would declare a mistrial, and immediately put the defendant upon trial again. Affiants further say that about nine-thirty o'clock, just after the judge had concluded his address, it was announced that the jury had made a verdict, and they were immediately brought from the hotel where the judge had caused them to be sent some hours before, and the verdict published. As soon as the verdict was published the defendant was sentenced, and, at the earliest possible moment, was removed by the officers from the county. Affiants say that feeling ran very high against the defendant, and there was great dissatisfaction expressed by various persons when it became known that the defendant had been removed by the officers to another county. Affiants say, that, from their observation and knowledge of conditions as they existed at that time, the defendant would have been lynched if the crowd had known that the officers intended to remove the defendant from the county, or if he had not been convicted by the jury; and affiants believe that the conditions which then existed have not materially changed, and that if the defendant is brought back to this county for trial he would be in grave danger of personal violence at the hands of irresponsible parties." Another disinterested member of the bar of the county testified orally to practically the same effect. The clerk of the superior court of the county and eight other citizens joined in an affidavit

containing language practically identical with that quoted from the affidavit referred to above. The movant and his attorney made affidavits tending to sustain the allegations of the motion; and that on account of hostile demonstrations of the crowd about the jail during the trial, and at night after its conclusion, the movant was taken to the jail of Bibb county wherein he has ever since been confined. The sheriff, in his affidavit introduced by the State, said: "The judge gave me instructions to take the negro away." We quote further from his affidavit, viz.: "I took him [Bivins] to Macon the next day after his conviction, on the two o'clock train, is my recollection; walked to the train with him; only one other person with me to help me take him to the train; went with him right down Eighth street to the depot; there was no attempted or threatened violence towards him on the trip. I took him away because a motion for new trial was made, there was considerable feeling throughout the county, and the motion had been made, and I didn't want to keep him in jail here, and I took him away for safety. The jail here is not so very good, it has been broken once before; it wasn't to keep him from breaking out that I took him away. I didn't want to have any more trouble about it. . . My opinion of what would have become of the defendant on that occasion, if the jury had failed to convict him, is that if I hadn't outguessed them there would have been a lynching. The reason that crowd didn't lynch him that night was on account of the Gleaton boys [sons of the person killed] going in among them and dispersing them. I know the crowd was listening to the Gleaton boys. If he was brought back here and acquitted, they would lynch him right quick if the Gleaton boys said so; but I don't believe they would do it anyway, whether the Gleaton boys said so or not. I base that on the fact that the Gleaton boys are men of good character and standing, and the other fellows say if you fellows don't want anything done we are not going to do it. The Gleaton boys were back of the whole business; and that night the crowd said if the Gleaton boys were satisfied they were, and were going home; and a bunch of boys stayed around here." One of the State's witnesses testified in part as follows: "If the negro hadn't been convicted, had been turned loose at that time, I sort of think if the officers hadn't handled him mighty nice and mighty slick they would have pulled

him, I sort of think so; the blood was running pretty high right at that time, you know; there was some of them that wanted to get hold of him, they would have killed him if they got a chance. I can't say so much about them being ready to make that chance for themselves, or they would have got him, but at this time the people's blood don't run so high. . . But I don't think there would be any danger at this time. I don't know what will be the result at this time if he was acquitted; I can't say about that." Another State's witness testified: "People have been lynched in this county. . . The reason I would think there would be no danger to this negro if he was brought back, I discussed this case with Preas Gleaton that night of the trial, and he told me that he was willing and was reasoning that the law should take its course." Language as follows is found in the affidavit of one of the State's witnesses: "In the event Honor Bivins is brought back here and placed upon trial for the offense of accessory before the fact for the murder of Mr. Gleaton, I will be compelled to acknowledge that whether he would be in danger of violence at the hands of the people of Crisp county would be according to what the verdict was, in my opinion. If he got what I believe is justice, there will be no trouble. If they want to bring him back here to clear him, I don't think they can do that in Crisp county. That is exactly the way I feel about it; that is my opinion. I don't recall any special one that I have heard express that sort of an opinion, but I have heard a great deal of expressions about it in different ways. I don't think that he could be brought back here and acquitted. I have my idea as to what the result would be if he was acquitted. I hardly know what to say about that; it would be according to who the crowd here was, and so on. If he had been acquitted before, he would have been lynched. I think the sentiment of the people is changed some all right. I really think that the sentiment has been all the time for the law to take its course; but of course if the jury got mixed up and wanted to turn him loose, or something like that, in the face of all the evidence against him, I don't believe—I am confident that the Crisp county people wouldn't put up with that, and that they would lynch him." Another State's witness testified in part as follows: "I think if this man was brought back here and acquitted he could go free. I think if the people wanted to lynch

that negro, they have done let the good time slip; they had all the chance they wanted to lynch him the day that he was tried; he was in the custody of the court officers, but they are both small men that had him in charge coming from the jail into court, and if the crowd had wanted him they could have got him. The crowd did gather around the jail in the afternoon, and part of them stayed until after the jury had convicted him; nothing like all the crowd stayed here. It was not common report among that crowd that if the jury didn't convict that negro they were going to lynch him. It is not the fact that the conviction of the negro was all that saved him from being lynched on that occasion; what I think saved him was that the Gleaton boys said they didn't want it done. I think that is absolutely what saved him from being lynched; and I think that if they had said they wanted it done, he would have been a dead negro. I think there were plenty of them ready to do it at that time, but the people that would have done it then wouldn't now. As to why I say that, I sort of judge by myself, I might have helped lynch him at that time, but I wouldn't do it at this time." After testifying that in his opinion the accused would be in no danger of being harmed if he were returned to Crisp county for trial, another State's witness said: "I think that men have been lynched here in Cordele, the jail broken into in broad daylight and a man taken out and lynched almost in the middle of the town, but that was on an occasion, and for a crime that the people won't stand for; there are crimes that they won't stand for—they lynch them. I can't say that I think it is right to lynch a man for any crime."

The State put in evidence the testimony of a number of witnesses, some given orally and some by affidavits, including several members of the board of county commissioners, and a son of the decedent. The son testified, in part, as follows: "In the event this defendant should be brought back here for trial before this court, I don't see why he shouldn't be tried by this court, in an orderly manner, without interference and without violence. I have heard nothing to indicate to the contrary. It is the disposition of our family, and of myself as the immediate representative of my deceased father, to see that he does get a fair trial, without interference. I have heard no expressions from any source from which I might conclude that there would be personal violence of-

fered toward this defendant. I would undertake myself to see that there was no such conduct on the part of any person. I was present at the former trial, and the court-room was packed with people from the four corners of the county on that occasion, and they remained here all day, stayed here after court adjourned that evening. I don't know that it was the general talk on that occasion that if that negro wasn't convicted he would be lynched; that wasn't our intention; at that time the feeling was high ·until —you know that people are going to talk, there are some people that are going to talk; but at the same time, the man that talks every time he is not the man that does business. I guess there were some threats made, not by me or the family, but by outsiders; probably was some threats of personal violence towards the defendant at that time. The judge came down to the court-room after supper that night, and made an address to the crowd; the crowd still stayed around here, didn't go home when court adjourned. There was a good deal of feeling aroused on account of the enormity of the crime, and should· have been; that feeling is not still there, not what I would consider the lynching part of it. I have talked to a good many people, and they have come to the conclusion that the best thing, and the only thing to do, since it has gone like it is, is to let the negro be tried and sentenced and hanged in this county. It is all right if he is acquitted; that will be absolutely all right. The feeling is that he should be hanged in this county if he is sentenced to hang. I mean if he is found guilty. I heard the affidavits read awhile ago, and statements made with reference to this man· being spirited out of the county after the verdict was rendered. He was taken out the next afternoon on the two o'clock train; he stayed here all night that night, and until two o'clock the next day; the sheriff took him right down there on the broad street, and on down to the train openly, just he and the sheriff, or he may have had one deputy with him. . . The sheriff did take him away, and he has remained away ever since; but they needn't have taken him away; we wouldn't have bothered him." A cousin of the wife of the decedent testified that in his opinion there would be no violence offered the accused if he should be taken back to Crisp county for trial, and "that the relatives of the deceased would undertake to see that there was no such thing done. I would do all that I could."

The chairman of the board of county commissioners testified that in his opinion no effort would be made to do the accused personal violence if taken back to the county for trial; and further: "I would, in my individual and official capacity, do all that I could to prevent anything of that kind." The general trend of the testimony of the witnesses for the State was to the effect, that they had resided in the county for many years, knew the people, had heard no threats made against the accused; that his case had been little discussed; and that they were of the opinion that no attempt would be made to do him personal violence if brought back to the county for trial.

The judgment rendered was as follows: "Upon consideration of above motion for change of venue, and of the evidence submitted by movant and the State, the motion is denied and refused. While, under the evidence, a sharp opinion of fact is raised, I feel that the officials of Crisp county can give movant ample protection against any attempt to do him violence, even if any should be attempted."

The act of 1911 (Acts 1911, p. 74, Park's Penal Code, § 964) provides: "It shall be lawful for the judge of the superior court of the circuit in which a crime is alleged to have been committed to change the venue for the trial of said case, on his own motion, with or without petition, whenever, in his judgment, the accused party will be lynched, or there is danger of violence being attempted to be committed on said accused, if carried back, or allowed to remain in the county where the crime is alleged to have been committed. And if a motion by petition shall be made by the accused for a change of venue, said judge shall hear the same at chambers, with or without the presence of the accused, at such time and place in the State as he may direct. And if the evidence submitted shall reasonably show that there is probability or danger of lynching, or other violence, then it shall be mandatory on said judge to change the venue to such county in the State as, in his judgment, will avoid such lynching." Obviously, under the evidence submitted upon the hearing of the motion for a change of venue, there existed, at the spring term, 1915, of the court when the movant was tried, a strong probability or danger of the movant being lynched or of personal violence being done him in the event of his being found not guilty. The question for de-

cision on the hearing of the motion for change of venue was whether the evidence submitted reasonably showed that there was probability or danger of the movant being lynched or of other violence being done him, if he should be carried back to Crisp county for trial; in other words, did the condition or state of things which existed at the trial continue to exist up to the time of the hearing of the motion? As tending to show that the state of feeing against the accused had not changed, it appeared that the sheriff, by direction of the presiding judge and for the safety of the movant, had, on the day after his conviction and sentence, removed him from the county of Crisp and placed him in the jail of the county of Bibb, and that he had been kept there continuously since that time.

Another thing to be considered is the form of the judgment, which stated, in effect, that the evidence raised a sharp opinion of fact, and that the judge felt that the officials of the county could give movant ample protection against any attempt to do him violence, even if any should be attempted. The question presented to the judge for decision on the hearing of the motion was not whether the officials of the county could give movant ample protection if there should be an attempt to do him violence, but the question was, as already stated, whether the evidence submitted reasonably showed that there was probability or danger of the movant being lynched or other violence done him if he should be returned to the county for trial. The judgment appears to have been founded upon the fact that the judge felt that the officials of the county could give movant ample protection against any attempt to do him violence, even if any should be attempted. This, in our opinion, was not a sound basis on which to found the judgment overruling the motion. It might be true that the judge was right in his opinion that the officers of the county could give movant ample protection against any attempted violence of his person, and also true that there existed a probability or danger of personal violence to him.

In view of what has been said, the judgment refusing a change of venue must be      *Reversed. All the Justices concur.*

LUMPKIN and ATKINSON, JJ., concurring specially. We concur in the judgment, though not in all that is said in the opinion, We think the evidence required the grant of change of venue. We

also think that the judgment of the presiding judge on its face does not indicate that he was satisfied that there was no reasonable probability of violence, but merely that he thought that the officers could overcome such violence if attempted.