## 26260. MITCHELL v. THE STATE.

DECIDED JUNE 1, 1937.

*O. J. Coogler, H. A. Allen,* for plaintiff in error.
*Roy Leathers, solicitor-general,* contra.

MacINTYRE, J. George Mitchell, a negro, was charged with having committed the crime of assault with intent to murder Grady Woodward, a white man. The defendant was convicted, and the Court of Appeals granted him a new trial on September 22, 1936. 54 *Ga. App.* 254. Subsequently, when the decision for a new trial was published, there were threats of violence against the defendant, and he was taken from his home at night and severely and painfully beaten. His case was subsequently assigned for trial

in the same county at the February term, 1937. When the case was called for trial the defendant made a motion for a change of venue.

The movant introduced affidavits of the following persons, all except T. M. Steele being residents of Clayton County; E. L. Adamson, the sheriff; Alan Kemper, the ordinary; W. H. Reynolds, the solicitor of the city court of Jonesboro; Watterson Royston, the county surveyor; W. D. Whaley, ex-mayor of Jonesboro, the county-site of Clayton County; O. L. Roberts, policeman of Jonesboro; E. L. Camp, and T. M. Steele. The affidavit of each affiant, omitting the formal parts, recited: "That at the time of the commission of the crime charged it was alleged that said defendant, colored, cut a white man, and that in connection with his arrest on said occasion violence was apprehended, and scarcely avoided by arresting officers in the gathering together of persons en route to and about the jail when the lights in the City of Jonesboro went out. Subsequent to the trial of said defendant in August, 1935, his motion for new trial and granting of the same by the Court of Appeals of Georgia on or about September 22d, 1936, when afterwards published and generally known, threats of violence to said defendant in the event he did not leave and remain away from the county was the subject of current rumors and discussion, and, as affiant has gathered from such rumors and believes, these threats were communicated to said defendant, who nevertheless remained in said county. That thereafter sometime in the latter part of September or the first of October of 1936, as affiant is informed and believes, said defendant was taken by persons unknown in the nighttime to a point probably six or eight miles south of Jonesboro into the County of Henry, where violent and serious injuries were inflicted upon his person, and that afterwards when said defendant became physically able to do so he removed from said county, concealing his whereabouts as has not been known to your affiant, and he does not believe to the public generally until recently, as affiant is now informed and believes he is out in the rural section from Hogansville, Troup County, Georgia, where he remains because of fear of threats of violence on his return to said county, and, as your affiant believes, there is probability or danger of such other and further violence to him at this time. Affiant further says that be-

cause of the nature of the alleged crime, the excitement aroused because of the same, [and] some political prejudice involved, that an impartial jury can not be obtained in the County of Clayton by the legal process provided in procuring the same." O. L. Roberts, the policeman, added to his affidavit the following: "I heard rumors and discussion that the defendant was told if he ever returned he would be treated worse than that time." T. M. Steele added to his affidavit the following: "Affiant found defendant in the woods on Sunday morning in the latter part of September or the first of October, 1936, badly beat up, not able to get up or stand up. He had been beaten up. He stated he had been brought out there by a crowd of white folks the night before, where they beat him up and told him if he did not leave Clayton County and stay gone that they would get him again and kill him."

Hon. John B. Hutcheson, Associate Justice of the Supreme Court of Georgia, who resides in Clayton County and for whom the defendant worked, made affidavit as follows: "That he remembers the occasion when he [the accused] was arrested about May, 1934, charged with an assault on Mr. Woodward; that he saw him the next day after it is said to have happened, and procured a doctor for him; that he is also acquainted with the circumstances of his trial about August, 1935, and he also remembers the severe beating that was given him after the Court of Appeals had granted a new trial; that he procured a doctor for him on that occasion, and has kept in touch with the case from the beginning until now; that he was in very bad condition after the beating in the fall of 1936, and has the scars on his head and body at the present time; that he saw him on Sunday after the beating on Saturday night; that he had been beaten so severely that he could not walk and could not talk coherently; that for at least a month after the beating, he was still unable to walk or stand alone; that deponent is acquainted with the situation surrounding this case, has heard the rumors and threats, and, in his opinion, it would not be safe for this defendant to go to Clayton County to be tried; and deponent believes that if he did, there would be grave danger of mob violence." The defendant swore that after the Court of Appeals granted him a new trial "a mob came to his home, looking for him, and found him at the home of Joe Nathan about 300

yards from where he was living; that there were three automobile loads of them, all white men, and they seized him, putting his head in a sack, so he could not see, and carried him across the county line into Henry County, several miles from his home, and gave him a severe beating, so much so that his head is now covered with scars where it was beaten so severely, his cheek bone was fractured, and there are other scars still remaining on his legs and other parts of his body; that while they were on the way to the place where the beating took place, he heard one man say that they might drown him, and another remarked that they would leave just a little life in him so that he could crawl into another county; that while they were beating him, he said, 'O Lord, O Lord, have mercy,' and one man in the crowd said: 'Don't call on the Lord. Call on that old gray-headed man you are working for. He is the only one who could help you now; and if he talks too much about it, we will do him the same way.' Deponent says that after he was thus beaten, he was unable to walk or stand up, but finally Mr. Tom Steele found him in the woods, and got some men to put him in a truck, and carried him home; that Judge Hutcheson got him a doctor, and as soon as he was able he left the county and went to a hospital, where he remained three weeks. After which time, he went to Troup County, and ever since he has been living there, and even since that time, he has received threats telling him not ever to come into Clayton County again under any circumstances, and if he did he would not get out alive. Deponent further swears that owing to the ill treatment he has already received, he is actually afraid to go into Clayton County, and honestly believes that if he did go he would be killed regardless of the outcome of any trial he might have. Deponent swears that he is entirely willing to be tried in any county in the Stone Mountain Circuit except Clayton, or at any other place, where he will not be killed or beaten, because he is conscious of his innocence of the crime charged against him."

The State introduced, as witnesses, Grady Woodward, T. C. Sower, Dr. W. D. Holton, C. D. Dickson, G. D. Medlock, J. A. Garner, W. A. McLendon, A. E. Rowen, W. W. Mundy, J. P. Porter, L. J. Brown, justice of the peace in the Jonesboro district, and P. K. Dickson, clerk of the superior court of Clayton County. Each of them testified in substance, on direct examina-

tion, that they knew and met a great many people from all sections of Clayton County, and that they had not heard any rumors to the effect that if George Mitchell was brought back and tried there would likely be physical violence inflicted on him; they knew of no reason to keep him from getting a fair trial in Clayton County; they hadn't heard any rumors to the effect that if he was brought back there for trial and exonerated he would likely be manhandled and mistreated. On cross-examination they testified in substance that they did not hear any rumors that the defendant was going to be taken out of his home and beaten after he was granted a new trial, until it had already been done. E. L. Camp, who signed one of the above-stated affidavits for the defendant, when sworn and put on the stand by the State at the hearing, testified on direct examination, in part: "My main object in signing that was I thought it best to take him where this case could be got shut of, and not be brought back and taken up by different parties. I haven't heard anybody say that they would cause him any pain and suffering." On cross-examination this witness testified: "I did' not hear anybody say they would beat him at the time that they did beat him last September when the Court of Appeals granted him a new trial. I do think this motion should be granted."

It appears that many good citizens of Clayton County were of different opinions as to whether the defendant would be in danger of physical violence. Conceding, however, that every word sworn to by the witnesses on both sides with reference to their opinions as to whether there was a probability or danger of violence is conscientiously believed by them to be true, yet we have the undisputed, cold and undenied fact duly established that this defendant was brutally beaten; and the facts established strongly tended to show this was done because the higher court had not acted in accordance with the wishes of a certain element of the citizenry. What assurance is there, if the trial court does not do their bidding, or rather act in accordance with their desires, that they will not again reap vengeance upon the accused in the nature of physical violence when he returns to that county for trial? As tending to show that the same state of feeling against the defendant had not changed, the sheriff, the officer of the law to whom both the State and the accused must primarily, in that county,

look for the upholding of the majesty of the law and the protection of the accused, has sworn that there is a probability or danger of violence to the defendant. The policeman, a preserver of the peace and good order in the county site where the defendant was to be tried, testified likewise. While a majority, or good proportion, of the citizenry of that county may not approve of such lawless conduct, nevertheless a certain element, even though they might be proportionately few, have done violence to the defendant; and obviously, under the evidence submitted, there is a probability of violence being done if the defendant is returned to that county for trial; and according to the evidence, in the event of his acquittal there is an even stronger probability of personal violence to him. The evidence for the State was negative and uncertain while some of the material evidence for the movant was absolute and positive, and on the question of former violence the evidence is undenied. Considered as a whole, the evidence required a change of venue. *Marshall* v. *State, 20 Ga. App.* 416 (93 S. E. 98). There is a different rule of evidence for determining whether a fair and impartial jury can be obtained and whether there is a probability or danger of lynching or other violence. *Johns* v. *State, 47 Ga. App.* 58, 64 (169 S. E. 688). We do not hold that a fair and impartial jury can not be obtained in Clayton County; but we do hold that obviously, under the facts and circumstances as disclosed by the evidence, there is a probability of violence being done the defendant, and for this reason we reverse the judgment of the trial court refusing to grant a change of venue. *Bivins* v. *State,* 145 *Ga.* 416, 423 (89 S. E. 370); *Graham* v. *State,* 141 *Ga.* 812 (82 S. E. 282).

*Judgment reversed. Broyles, C. J., and Guerry, J., concur.*