### 33517. AVERY *v.* THE STATE.

DECIDED APRIL 10, 1951.

*Gleason & Painter, Shaw & Shaw,* for plaintiff in error.
*John W. Davis, Solicitor-General, Robert Coker,* contra.

MACINTYRE, P. J. James Avery was indicted by the grand jury of Walker County for the offense of rape. He filed a petition for a change of venue in which he alleged that he is a negro and that he is charged with the offense of rape upon a white woman; that the alleged offense is supposed to have oc-

curred on October 29, 1950, and that on the same night the defendant was arrested but was removed from the Walker County jail to another county and there confined because the sheriff of Walker County believed that a mob would be formed to lynch the defendant if he remained in confinement in Walker County. Upon the hearing of the petition or motion for change of venue, the judge of the Superior Court of Walker County overruled the motion and refused to order a change of venue to which judgment Avery excepted.

There was evidence by witnesses to the effect that, based upon the discussions they had heard and other things within their knowledge, there was a probability or danger of lynching or other violence being committed upon the accused if he were carried back to Walker County for trial. There was evidence to the contrary by witnesses who testified that in their opinions the accused could be carried back and safely tried in Walker County. If there had been only this contradictory opinion evidence, the judge of the Superior Court of Walker County would have been authorized to decide the issue for or against the motion for a change of venue, but the sheriff of Walker County, whose responsibility it was to protect the accused, testified: "I am sheriff of Walker County. On the night of October 29, 1950, there was turned over to me for safekeeping a colored man, named James Avery. As to what time this man was turned over to me as sheriff; well, I don't know just exactly what time, but it was between, I believe 9:30 or 10, something like that, could have been a little later, I didn't look at my watch. George Arnold and Mr. Potter, of Chickamauga, turned this man over to me. They were the only two with him when they brought him to me. I lodged James Avery in the Walker County jail, at LaFayette, in Walker County, Georgia. Yes, during that night someone called at the jail; after we locked him up George and Mr. Potter came in the kitchen, and we stood there and talked a few minutes and they went on out the door, and I had the lights off in the kitchen, as soon as they went out the door I turned the last light off, and I got me a glass of milk, and they had been gone, I guess, probably ten minutes, and this car came in from around this way. . . The car stopped right under that street light by the jail there. It was

sort of a light blue car, and as well as I could tell from looking through the crack of the venetian blinds, I didn't turn the light on, it looked like about a '39 or '40 Dodge. There were four men in that car. That was just about fifteen minutes after Mr. Potter and George left. . . No, the four men did not get out of the car at the same time, the man on the right in the front seat got out, two men in the back and one stayed under the wheel. I did not know the man who got out of the front seat of the car. If I had ever seen before I didn't recognize him, because it was just done like that, he didn't say anything and I didn't either. As to where he came after he got out of the car; well, he came to the back kitchen door; you see the screen at the back opens to the right, and then the door inside opens to the left, and just as he caught hold of the screen, well I opened the door, and when he saw me he broke and run back to the car . . so I thought he had gone back to the car to get his gun, and I went and got mine, and they jumped in the car and went north on Duke street, and then I jumped in the car [his car] . . I wanted to see if I could recognize the men and get the number of the car . . but I never did see them . . they left the jail without their lights on. The only thing that I can state is the physical situation that then occurred, he didn't say anything and I didn't either, it looked suspicious him not saying something and breaking and running. . . After that incident occurred, as to whether or not I removed my prisoner; well, I did after I got back, yes sir; that very night. Yes, I moved him some considerable distance from LaFayette; the first time I moved him thirty miles. Yes, I lodged him in another jail thirty miles away. As to when I made another move of the prisoner; well, the situation over there, Sheriff Vining just has one little room for colored women, and so he called me and told me he had a murder and he had to have the room, and so then I moved him on to Atlanta to Fulton Tower, and my prisoner remained incarcerated in Fulton Tower from that time on. This prisoner is not now in Walker County. As to why not; well, I just didn't want him here, because I don't have but just one deputy, and my wife is out there and the cook, and I don't know what might happen; she don't hardly ever go in the jail; we turn the men out of the cages in daytime and

lock them in the cages at night; they might take advantage of women folks handling the keys; we have visiting days, Wednesdays and Sundays, and I couldn't keep a man there all the time and do all the work myself, it takes two to do it. As to whether or not by reason of the fact as sheriff being responsible for the safekeeping of my prisoner against any attempted rescue, it is my opinion that safekeeping of that prisoner required his removal from this county; well, at that time, just like the witnesses said the morale of the people was up, and I didn't want anything to happen, I didn't know what might happen. There was a big wave of public excitement to start with. As to whether or not I heard anything that they ought to lynch this negro; well, just like others say, they ought to take him out and lynch or hang him, just like you have heard anybody say, ought to shoot that fellow. As to whether or not those expressions were made by responsible and reliable citizens; well, yes, some of them was, just made in a conversation, like ought to give that fellow twenty years; I reckon every officer has to hear a lot of things from different people that outsiders don't, and they want to express your opinion about it and what should be done with him, and I say, I think he should have justice, he is innocent until he is proven guilty. Yes, it is my intention to leave this prisoner at the place outside of Walker County until the date of trial, if it is tried in this county. As to whether or not any report came to me that an effort was made in the City of Chickamauga to have the siren of the fire department turned on to arouse the public to work up a mob to take this negro out and lynch him; well, it was told up there at Chickamauga that they tried to get someone to call the operator to call the fire department out, the people as I understand, turn out for a fire department call like they do here in LaFayette, we have a bad situation here following the fire truck, and people really do turn out. As to whether or not that information came to me from a rather reliable source that an effort would be made to arouse a mob to carry out the lynching by that act; well, they said they wanted to do that; George Arnold and Mr. Potter had the boy and they brought him on down to LaFayette. As to how long it was after this incident occurred that that report of arousing the public to work up a mob for a lynching; well, that

was the night they had him up there, before they brought him down here. Yes, the very night, and since then I have been back to Chickamauga lots of times, and haven't heard anything until they had a special grand jury called to indict him, and since then it is very little that I have heard about it. Since the special grand jury met and indicted James Avery, I have heard no further talk of a lynching. As to whether or not up until the time the judge of the superior court called a special session of the grand jury, I did hear some talk; well, yes sir, they said they ought to lynch him and ought to hang him, that he was guilty of the crime; I said, well, I am going to do my best to protect the boy, if it costs me my life. . . Yes, I have made a visit up in and around the community of Coke Oven and the City of Chickamauga during the last few days, been there several times, up there yesterday. As to whether or not I specifically inquired or brought up the subject of this James Avery boy; well, no sir, I was serving subpoenas, and witnesses that I had served said, I don't know anything; I said, I am sorry, these subpoenas were given to me, I says, you will just have to be down there. If there had been any excitement or high feeling about this case I would have found it out, I had seventeen or eighteen subpoenas and everyone I gave a subpoena to they didn't say anything, only just didn't know anything about it. Based on everything that has happened and everything I know up to the present time, as to whether or not it is my opinion that James Avery could be safely tried for the offense for which he is charged in this county without any danger of violence being committed upon him; well, I believe he could now, the way the people feel about it; what I have just heard, and I can get plenty of help to make it safe. I don't have any idea that I need any help. As to why I don't bring James Avery back to the jail today; well, I can bring James Avery back here, but I would surely sit right down there myself, I would want to be sure, the boy is in my care, I wouldn't want to bring the boy back here and something did happen and me have to suffer for it, I just don't believe they could come in there and take him away from me, but I just can't stay there all the time, I have just got to get out and work. As to whether or not I feel that he would not be as secure as other prisoners now in the jail

without additional assistance and a police force to protect any eventuality; well, I wouldn't feel as safe with him here as the other prisoners out there, because they are not charged with what he is charged with. As to whether or not then the fact that he is charged with what he is charged with, rape on a white woman, causes me to believe that there is a possibility of violence; well, I will state this, that if something was to turn up in the future and me gone, wife couldn't handle it. As to whether or not because of the possibility that some violence might turn up in the future I feel that he will be more secure in a jail quite some distance from LaFayette, well (examination by the court). The reason I don't have him here now is that I am short of regular forces, I don't feel like keeping the boy there as I am gone and a lot of the time George is gone, and the cook there she is a colored girl, then my wife stays there quite a bit, and I just don't feel safe or something like that, if I had a man in there for murder and I couldn't be there I would want him moved [to] some other place. As to whether or not I feel that a man charged with that serious offense that I should use more precaution to protect him; well, in this jail out there, the situation is this, we do not have any solid places, if they got inside and couldn't get him out, they could shoot him through the bars, he wouldn't have no chance. If this man, James Avery, should be brought back here for trial I could deputize as many men as I needed and I can get six or seven State Patrolmen up here. In the event he should be brought back here for trial, as to whether or not, in my opinion, I could protect him against any probable violence either while in jail and being brought to and from the court room and while in the court room; well, yes sir, I would do my best. Yes sir, I think I could protect him. Yes sir, we had some other prisoners out there at the time he was brought in there, we had some upstairs, we didn't have any colored people. These fellows that I said came there that night were white; they didn't announce what their business was, didn't but one man get out of the car, the man on the right front seat got out, one man stayed under the steering wheel and two men in the back seat. . . If I had a white man in jail charged with the same crime on a white woman would I surely move him. As to whether or not I have

ever done it; well, we have never had but one since I have been there. No sir, I did not move him."

George Arnold testified: "I am a city policeman over at Chickamauga, and am also a deputy sheriff. I am the one that arrested James Avery on the night it is alleged he committed the offense of rape upon a Mrs. Hollingsworth. My duties as city policeman causes me to come in contact with quite a few of the citizens over at Chickamauga in all walks of life. . . As to whether or not I have heard considerable discussion of this case since the night I made the arrest of James Avery; well, I have heard some, quite a bit. I have not heard any suggestion that there might be such a thing as a lynching of James Avery. Based on all the discussions that I have heard or anything else that I might know about it, I think that James Avery could be tried here in this county without danger or violence being committed upon him. . . Yes, I work during the day, and I see the citizens throughout the day and a good bit of the citizens stop and talk with the policeman, and the policeman gets a pretty good cross view of what folks are thinking about in public matters. Yes, I am interested in administering justice in accordance with the rules of the books. In any of those conversations, as to whether or not anybody has said to me that that negro ought to be lynched; well, I might have heard that in ways, you know, you will hear talk like that, first one and the other talking around, some will make that remark. I didn't hear that remark from the representative group of citizens, the business people and intelligent, good people in the community such as down here today. As to what element of the population I did hear that remark from; well, it might have been just some casual remark made that you would hear most anywhere in cases like that, someone would make the remark, he ought to be took out and lynched or he ought to be hanged, something like that. From the element that would make a remark like that in a community, or would be a party to such a terrible thing, I wouldn't say there was any sizable amount of influence in that direction. No one came to me that night and asked me to notify or request them to sound the siren there in the fire department. I hadn't heard that before until today. Outside of the few scattered remarks that I have heard to the effect that he

ought to be lynched such as I have testified about, I haven't observed any sizable amount of aroused public sentiment to do that negro violence. . . Yes, I have heard sayings like so and so ought to be shot where a man had no idea of doing it, but just said it, and I have heard it where he did have an idea of doing it. These remarks I said that I heard to the effect that James Avery ought to be lynched or ought to be hung, as to whether or not the people that I heard say them sounded like they had any intention of doing it, or whether they just made that remark; well, just making a remark; you might have heard the remark yourself, just some casual remark like that, somebody will say without thinking anything about it. Yes, the Chattanooga papers are circulated over there in Chickamauga, the Times and the Free Press. As to whether or not I noticed in them anything to the effect that there was a good bit of ill feeling that existed over there in Chickamauga; well, I noticed one write up, I believe, something about it. At the time I read that as to whether or not I found that that was true or whether I thought that statement in the paper entirely wrong; well, I couldn't find where it was anything to make me believe that there was anything to it; I just figured some reporter making a story."

By the act of 1911 (Ga. L., 1911, p. 74), amending the act of 1895 (Ga. L., 1895, p. 70), as codified in Section 964 of Volume 2 of the Code of 1910, shows that the legislature was unwilling to leave the law as to change of venue in criminal cases, as it stood before this amendment, to the general determination of the judge as to whether a fair and impartial trial could be obtained, but passed this additional act to the effect that "if the evidence submitted shall reasonably show that there is probability or danger of lynching, or other violence, then it shall be mandatory on said judge to change the venue to such county in the State, as in his judgment, will avoid such lynching." (See this act as codified in the Code, §27-1201.) This amendment did not merely confer upon the judge a power or discretionary right but placed upon him a solemn and mandatory duty. The reading of this amendment will show the imperative nature of the duty placed upon the judge of the superior court if the evidence reasonably shows that there is a probability or danger of lynching or other violence. *Kennedy v. State,* 141

*Ga.* 314, 318 (80 S. E. 1012). The judge's mind does not necessarily have to be free from uncertainty or doubt but if there exists in his mind a probability that personal violence will be done the accused he should change the venue. *Geer* v. *State*, 54 *Ga. App.* 216 (187 S. E. 601).

Conceding that the witnesses were of *different opinions* as to whether the accused would probably (not necessarily) be in danger of physical violence, we have the undisputed facts that after the accused had been placed in the Walker County jail by the sheriff and two policemen, and after the two policemen had left the jail and the sheriff had turned out the lights, four men, ten or fifteen minutes later, drove boldly under a street light in front of the jail; one of them got out of the car in which they were riding, leaving the other three in the car with the engine still running, and went to the side door of the jail and opened the screen door, and when the sheriff, who had remained inside the jail, opened the inner door and confronted this man, he fled back to the waiting automobile and then all four of the men fled in the car with the sheriff in pursuit of them. There was no other negro in the jail at that time and it does not appear that there was any other prisoner in the jail whose alleged crime would arouse public excitement and ire. The policeman, Arnold, a witness for the State, testified in effect that it had been said to him that the negro (the accused) ought to be lynched but that he did not hear such remarks from "the representative group of citizens, the business people and intelligent, good people in the community such as down here today [attending the trial]," which, of course, included the witnesses for the State who apparently belonged to this class. Mr. Arnold testified also that the "element of the population" he heard make such remarks as to lynching or hanging the accused, he would say, did not have "any sizable amount of influence in that direction." Outside of a few scattered remarks that he had heard that the accused ought to be lynched or hanged, he had not heard of any sizable amount of aroused public sentiment to do the negro violence.

It seems to us that the gist of the sheriff's testimony was that there was a reasonable probability, from what he saw and heard, that the persons in the car which came to the jail came for the accused to do him violence. Just what other reasonable prob-

ability was there? There might be other farfetched conjectures, but we do not see any other reasonable probability than that they came to the jail to do violence to the accused. Relative to such a probability or danger of violence, the sheriff, though persistently pressed upon the stand to say there was no probability or danger of violence, it seems to us, never went further than to say that he could swear in enough deputies to protect the accused against attempted violence. This might be true, yet it might also be true that even so, there existed a probability or danger of personal violence to the accused. *Bivins v. State*, 145 *Ga.* 416, 423 (89 S. E. 370). It seems to us that the gist of the testimony of Mr. Arnold, the policeman and the deputy sheriff, relative to the remarks of some citizens that the accused ought to be lynched, was that these remarks did not come from "the representative group of citizens, the business people and intelligent, good people of the community" such as were attending the trial, but such remarks came from a group or element of the population that did not have a "sizable influence in the direction" of getting a crowd to lynch the accused.

Though the accused might not be in danger from "the representative group of citizens, the business people and intelligent, good people of the community" such as were attending the trial of the question of the change of venue, yet there had been remarks from another group of uninfluential citizens that the accused ought to be lynched, and although we concede that the accused was in no danger from "the representative group of citizens, the business people and intelligent, good people of the community", and that these representative citizens testified that they had not heard remarks that the accused ought to be lynched and were of the opinion that he could be safely tried in Walker County, yet, we have the undisputed and undenied facts of what transpired at the jail within ten or fifteen minutes after the accused was arrested and placed therein, and the fact that the defendant had been transferred immediately beyond the limits of the county for safekeeping, and *had not been brought back at the time of the hearing of the motion for a change of venue.* The evidence for the State was negative and uncertain, while some of the evidence for the accused, which was material, was absolute and positive.

A part of the material evidence for the prisoner given by the sheriff, that the automobile drove up in front of the jail full of men; one got out, left the others in the car, went to the side door of the jail, opened it and being unexpectedly confronted by the sheriff, fled to the automobile whose engine had never been shut off and which was kept in readiness to move without loss of time, are the acts of persons who expect to commit a crime and escape with their confederates. True to form they fled in their car without any lights thereon and were pursued by the sheriff as soon as he could arm himself, but he was unable to overtake them. The sheriff immediately removed the prisoner for safekeeping to another county to protect him from probable personal violence and he seemed not to want to assume the responsibility of bringing the prisoner back into the county even on the day of the hearing on the motion for a change of venue.

Considered as a whole, we think that the evidence required a change of venue. We do not hold that a fair and impartial jury could not be obtained in Walker County, but we do hold that from the facts and circumstances as shown by the evidence there was and is a probability and danger of violence being done the accused if he is brought back to Walker County for trial, and for this reason we reverse the judgment of the trial court refusing to grant a change of venue. *Mitchell* v. *State,* 55 *Ga. App.* 842, 847 (191 S. E. 500); *Geer* v. *State,* supra; *Graham* v. *State,* 141 *Ga.* 812, 819 (82 S. E. 282).

*Judgment reversed. Gardner and Townsend, JJ., concur.*